IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK E. VOLITIS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-05425 |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

Giles, J.                                                    October 19, 2007

**I.  Introduction**

Before the court are Defendant Independence Blue Cross' ("IBC") Motion to Dismiss

Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and Plaintiff Patrick E. Volitis' Motion

to Strike Defendant's Reply.  Plaintiff brings suit, on behalf of himself and as representative of a

putative class, against IBC to recover alleged coinsurance overcharges, pursuant to Section

502(a) of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).

Defendant's Motion to Dismiss is herein GRANTED and Plaintiff's Motion to Strike

Defendant's Reply is DENIED for the reasons that follow.  In short, Plaintiff's claims against

IBC fail as a matter of law because IBC clearly disclosed the method for determining coinsurance

payments in the plan documents and reasonably applied the terms of the plan language in

determining Plaintiff's coinsurance payments.

## II.  General Background

In considering Defendants' motion to dismiss, the court accepts all of Plaintiff's allegations as true and draws all reasonable inferences therefrom in his favor.  See Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).  Plaintiff is a former employee of Merck & Co., Inc. ("Merck") and member of a collective bargaining unit, through which he subscribed to a Personal Choice health plan (the "Plan" or "Merck Plan"), which was insured and administered by IBC. Plaintiff was covered under the Merck Plan until May 31, 2006.  Under the Merck Plan, Plaintiff was required to pay as coinsurance a percentage of the covered expense and up to a cap of $500 in out-of-pocket payments per year.

During the first five months of 2006, and specifically in February and March 2006, Plaintiff received medical services for which he sought benefits.  There is no allegation that Plaintiff was denied medical services to which he was entitled or insurance coverage for those services.  Rather, Plaintiff alleges that IBC denied him benefits by not passing on discounts and by overcharging him in calculating his coinsurance payments.

Plaintiff alleges that IBC calculated coinsurance payments on the amount of an "Allowance" that bore no relationship to the actual amount the IBC paid to the service provider, forcing subscribers to bear a disproportionate amount of the actual cost of health care.  Plaintiff asserts that this practice was not disclosed in and is contrary to the Plan documents, which Plaintiff claims does not require an insured to pay more than 10% of the actual cost of service, after deductible.

For example, Plaintiff claims that IBC sent Plaintiff an "Explanation of Benefits" calculating that Plaintiff owed 10% of a $1,661.19 "Allowance" for an MRI at Doylestown

Hospital.  Plaintiff believed that he discovered that the actual cost that IBC paid Doylestown Hospital was only $816.20, less than half of the "Allowance."  Plaintiff maintains that this practice effectively doubled his coinsurance percentage from 10% to 20%.

After Plaintiff discovered this, he challenged the alleged over-charge through IBC's administrative procedure.  IBC granted him a one-time administrative exception, corrected the "Allowance" amount to match the amount billed by Doylestown Hospital, and told him that the miscalculation was due to a system error.  Despite this explanation, Plaintiff maintains that IBC continued to overcharge him for a subsequent MRI at Doylestown Hospital and for services on two occasions at Central Montgomery Hospital.

It is undisputed that Plaintiff exhausted his administrative remedies through two separate appeals in which IBC upheld the alleged coinsurance overcharges.

Plaintiff argues class certification would be appropriate under Rules 23(b)(1), (b)(2), or (b)(3) of the Federal Rules of Civil Procedure.  He defines the class as:

> All subscribers to health insurance plans offered by IBC who made payments to 'in-network' medical product or service providers under a percentage co-insurance plan where an agreement existed between IBC and the provider to accept a discounted fee and where IBC did not use that discount in calculating the subscriber's co-insurance payment.

(Compl. ¶ 12.)

Plaintiff estimates that the class will number in the thousands because IBC has over 3.7 million subscribers, including 2.7 million locally.  Plaintiff asserts there are common questions of law and fact, that his claims are typical, and that he will fairly and adequately represent the interests of the members of the Class.

Plaintiff asks the court to certify the class action, appoint Plaintiff's counsel as class

counsel, declare that IBC health plans require calculation of coinsurance payments based on actual costs (including negotiated discounts), and award benefits to the class and Plaintiff's costs and attorneys' fees.

### III.  Legal Standard for Motion to Dismiss

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  The court must accept all of plaintiff's allegations as true and draw all reasonable inferences therefrom.  See Jenkins v. McKeithen, 395 U.S. 411, 421 (1969) ("[T]he material allegations of complaint are taken as admitted."); Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993) ("At all times in reviewing a motion to dismiss we must 'accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.'" (quoting Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990))).

### IV.  Discussion

Defendant raises two main grounds for dismissal.  First, the court addresses Defendant's argument that Plaintiff lacks standing to bring a claim.  Next, the court addresses Defendant's arguments relating to its benefits determination.  The court herein determines the appropriate level of review and whether IBC properly exercised its discretion in making the benefits determination.  This entails examination of the relevant Plan terms.

**A.      Standing.**

Defendant argues that Plaintiff does not have standing under ERISA, 29 U.S.C. §§ 1001-1461, because Plaintiff terminated his coverage under the health benefits program on May 31, 2006 and is not entitled to benefits under the Merck Plan.  Plaintiff must be a participant in the Merck Plan to seek a remedy under ERISA, for both standing and subject matter jurisdiction purposes.  See Miller v. Rite Aid Corp., 334 F.3d 335, 340 (3d Cir. 2003).  ERISA defines participant as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan."  29 U.S.C. § 1002(7).  The definition of participant includes "former employees who . . . have a colorable claim to vested benefits."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989).  A colorable claim means a non-frivolous claim.  Miller, 334 F.3d at 342.  The plaintiff bears the burden to show standing "with the manner and degree of evidence required at the successive stages of the litigation."  Id. at 343 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

Defendant does not argue that Plaintiff's claim is not colorable or that no benefits were vested.  Instead, Defendant argues that Plaintiff received all benefits to which he was entitled under the Plan, and is not entitled to more.  Defendant further argues that under either Defendant's or Plaintiff's interpretation of the Plan language, Plaintiff had enough medical coverage claims to have reached the $500 out-of-pocket cap for coinsurance.  Because Plaintiff could not pay more or less than this $500 cap, Defendant argues that Plaintiff has not suffered any actual injury for which he can seek a remedy under ERISA, and therefore lacks standing.

The rates and/or costs of services Plaintiff received and whether the $500 would have

been reached, however, would have to be determined through discovery. Therefore, the court cannot decide the standing issue on a motion to dismiss.

Plaintiff alleges that he was wrongfully denied additional benefits under the Plan to which he was entitled, during a time in which he was indisputably a member of the Plan. At this juncture, considering the legal posture accorded a motion to dismiss, the court concludes that Plaintiff has met his burden to show standing as a former employee who has a colorable claim to vested benefits. See Firestone, 489 U.S. at 117; Miller, 334 F.3d at 341-21.

**B.      Review Of The Benefits Determination.**

The parties do not dispute that this matter is governed by ERISA, but dispute the applicable standard of review of IBC's benefits determination. ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

ERISA does not provide a standard of review for an improper denial of benefits claim. Post v. Hartford Ins. Co., No. 05-4927, 2007 U.S. App. LEXIS 21911, at *13 (3d Cir. Sept. 13, 2007) (precedential). The U.S. Supreme Court held that the default standard of review in § 1132(a)(1)(B) cases is *de novo*, but noted that where a plan gives the administrator discretion, the administrator's decision should be upheld unless there is an abuse of discretion, under an arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Post, 2007 U.S. App. LEXIS 21911, at *13. A decision is arbitrary and capricious if it is

"without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 392 (3d Cir. 2000).  The Court further noted, however, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" <u>Firestone</u>, 489 U.S. at 15 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)).

Where there is a conflict of interest, the Third Circuit follows a "sliding scale" standard of review to determine whether the administrator abused its discretion.  <u>Post</u>, 2007 U.S. App. LEXIS 21911, at *14-16; <u>Pinto</u>, 214 F.3d at 392.  Under this standard of review, "if the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most of its discretion is stripped away." <u>Post</u>, 2007 U.S. App. LEXIS 21911, at *14 (citations omitted).  This sliding scale review allows a court to "review[] the merits of the [administrator's] interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of beneficiaries." <u>Stratton v. E.I. DuPont De Nemours & Co.</u>, 363 F.3d 250, 254 (3d Cir. 2004) (quoting <u>Pinto</u>, 214 F.3d at 391).

The parties do not dispute that the Merck Plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the Plan, which requires the abuse of discretion standard of review.  <u>See</u> <u>Firestone</u>, 489 U.S. at 115.  Nor do the parties dispute that there is a conflict of interest because IBC both administers and insures the Merck Plan, and that its benefit determinations therefore are subject to a heightened form of the arbitrary

and capricious standard of review.  See Pinto, 214 F.3d at 383.  Rather, the issue is where on the

sliding scale the heightened review should fall – on the lower end, just shy of arbitrary and

capricious review, as Defendant argues, or on the higher end, according little or no deference to

the administrator's determination, as Plaintiff argues, or somewhere in between.

       The Third Circuit describes the application of the sliding scale standard of review as

follows:

       [C]ourts first consider the evidence that the administrator acted from an improper
       motive and heighten their level of scrutiny appropriately.  Second, [courts] review
       the merits of the decision and the evidence of impropriety together to determine
       whether the administrator properly exercised the discretion accorded it.  If so, the
       decision stands; if not, the court steps into the shoes of the administrator and rules
       on the merits itself.

Post, 2007 U.S. App. LEXIS 21911, at *16-17 (citations omitted).  The court's "touchstone" is to

make "a common-sense decision based on the evidence whether the administrator appropriately

exercised its discretion."  Id. at *17.


       1.      Level Of Scrutiny.

       Turning to the first prong, the court examines whether the administrator has an improper

motive and determines what level of scrutiny to apply.  See id. at *16. Courts must consider

structural and procedural factors in determining how to apply the arbitrary and capricious

standard of review.  Id. at *17; Pinto, 214 F.3d at 392-93.  "The structural inquiry focuses on the

financial incentives created by the way the plan is organized, whereas the procedural inquiry

focuses on how the administrator treated the particular claimant."  Post, 2007 U.S. App. LEXIS

21911, at *17.

a.     **Structural Analysis**.

The structural inquiry is broad and seeks to determine "whether the structure of the plan raises concerns about the administrator's financial incentives to deny coverage improperly." Id. at *21.  Some non-exclusive structural factors include: "(1) the sophistication of the parties[;] (2) the information accessible to the beneficiary[;] (3) the financial arrangement between the employer and administrator[;] . . . (4) the financial status of the administrator"; (5) "the administrator's claim evaluation process"; (6) whether the beneficiary is a former employee, where dissatisfaction with the claims-handling process may not filter back to the employer or result in any pressure on the administrator to take corrective measures; and (7) whether an outside insurer funds and administers the plan, which raises the concern that the administrator has a financial incentive to deny claims.  Id. at *20-22, 28 (citing Stratton, 363 F.3d at 255; Pinto, 214 F.3d at 389, 392).  The structural analysis does not inquire into the administrator's behavior, which falls under the procedural inquiry.  See id. at *23.

Although a structural conflict of interest alone can require heightened review, it alone does not warrant more than a moderate heightening of review.  Id. at *18, 23, 25.  Even if a structural conflict of interest is found, the level of scrutiny to be applied also depends on procedural factors.  Id. at *24-25.  Thus, "[w]hen there is a structural conflict of interest mitigated by independent claim evaluation and no evidence of procedural bias," review is only heightened slightly.  Id. at *24 (citing Stratton, 363 F.3d at 254-56).  "Where structural bias is not mitigated by independent claim evaluation," review is heightened "a bit more."  Id. (citing Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 199 (3d Cir. 2002)).  Ultimately, even where a structural conflict of interest exists

warranting more searching review, the court defers to "an administrator's reasonable and carefully considered conclusions" unless there is "evidence that bias infected the particular decision at issue." Id. at *25 (citation omitted).

As previously noted, it is uncontested that the administrator is an outside insurer that makes claim determinations. The Third Circuit has held that this precise situation presents a substantial conflict of interest. See id. at *28 (citing Pinto, 214 F.3d at 393). Additionally, because Plaintiff is a former employee, "it is doubtful that [his] dissatisfaction with the claims-handling process will filter back to [the former employer] and translate into pressure on [the administrator] to deal more precisely with claims." See id. Also, as Plaintiff correctly argues, the sophistication imbalance between the parties weighs in favor of heightening the standard. See Stratton, 363 F.3d at 254 (noting that "[t]here is no reason why [plaintiff] would have had ERISA or claims experience, whereas [the administrator], a large, successful company with many employees, had numerous such claims").

The court finds that these structural factors present a substantial conflict of interest and require raising the standard of review to at least a moderately heightened review. See id. at *28 (citing Pinto, 214 F.3d at 393) (finding that where "the administrator is an outside insurer that makes claims decisions itself" and the beneficiary is a former employee, these structural factors presenting a conflict of interest "are sufficient to require at least moderately heightened review").

Plaintiff raises other arguments in favor of further heightening the standard of review on structural grounds, but the court finds that these do not counsel in favor of heightened scrutiny. Plaintiff argues that the lack of information available to the beneficiary weighs in favor of further

heightened scrutiny.  He argues that "subscribers face a serious information deficit" in that the Plan language is "prolix and vague," not easily understandable, and fails to disclose IBC's "alleged practice of forcing subscribers to bear a higher percentage of the actual costs of medical care than the designated coinsurance percentage."  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss 10.)  Plaintiff, however, does not allege that IBC denied him access to the Plan documents.  As discussed fully below, the court finds that the Plan language is clear and accurately discloses the manner in which coinsurance amounts are calculated.

Plaintiff also argues, without providing legal support, that IBC has a severe conflict of interest because Plaintiff had challenged IBC's methodology "that resulted in a fixed policy of denying subscribers the full benefits to which they were entitled."  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss 8.)  Because such a challenge went beyond entailing a factual determination on an individual basis, he argues that IBC had a heightened financial conflict of interest.  Plaintiff's argument assumes that such a challenge would influence the filing and/or outcome of claims of denial of benefits from other subscribers affected by the challenged policy, thus raising the financial stakes for potential pay-outs by the administrator.

It does not reasonably follow, however, that Plaintiff's three separate administrative appeals would have had any class-wide impact even if they raised class-wide, policy-level issues, for they were necessarily filed by an individual subscriber.  Therefore, it does not follow that the administrator would have the type of financial conflict of interest that a class action might present, if one could be presented on administrative appeal.  Furthermore, it does not reasonably follow that the administrator could <u>only</u> have viewed Plaintiff's claims as a challenge to its methodology, allegedly presenting a heightened financial conflict of interest, as opposed to a

challenge to the administrator's interpretation of the Plan language, an issue often raised in denial of benefits claims and presenting no particularly heightened financial conflict of interest. Drawing all reasonable inferences in his favor, Plaintiff's argument does not justify further heightening the standard of review based on structural factors.

Although the court finds that the structural conflict of interest present here warrants more searching review, and at least a moderately heightened review, the court still must defer to an "administrator's reasonable and carefully considered conclusions" unless there is "evidence that bias infected the particular decision at issue." See Post, 2007 U.S. App. LEXIS 21911, at *25. Consequently, the court turns now to the procedural inquiry to determine if raising the degree of review is warranted, or if any absence of procedural factors may have a mitigating effect. See id. at *24-25.

### b.    Procedural Analysis.

Under the procedural inquiry, courts must "examine the process by which the administrator came to its decision to determine whether there is evidence of bias." Id. at *25 (citing Pinto, 214 F.3d at 393). If any irregularities are "minor, few in number, and not sustained," there is little justification for raising the level of scrutiny much at all. Id. at *26. If the irregularities are "more serious, numerous, or regular," a more heightened review and less deference may be justified. Id. Reversal of a benefits determination may be warranted where there is evidence that the administrator's decision was both incorrect and biased, raising an inference of "anti-claimant bias." Id. at *26-27 (citing Pinto, 214 F.3d at 395). If there is both

evidence of structural and procedural bias, review is heightened substantially.  Id. at *27 (citing

Pinto, 214 F.3d at 394).

Citing Pinto v. Reliance Standard Life Insurance Co., Plaintiff argues that the standard of

review should be further heightened because IBC's conduct constitutes "a reversal of position

without additional . . . evidence."  See 214 F.3d at 393.  In Pinto, the administrator reversed its

initial determination that the plaintiff was totally disabled without any new medical information.

Id.  The Third Circuit found that this "[i]nconsistent treatment of the same facts" should be

viewed with suspicion.  Id.

Plaintiff argues that IBC's grant of his first appeal but denial of his other two appeals, in

which the same issue was presented, similarly should be viewed with suspicion.  The letter from

IBC granting his initial appeal stated that a decision had been made to "correct the Explanation

of Benefits to match the allowed amount being billed by Doylestown Hospital," and that a system

error had reflected the incorrect allowed amount, but that the correction was a "one-time

exception."[1]  (See Compl. ¶ 27.)

The present case is distinguishable from Pinto.  Unlike in Pinto, IBC explicitly made a

one-time exception to the provisions of the Plan documents so as to grant Plaintiff the claimed

benefits, not reverse an earlier grant of benefit claim.  The decision did not resolve or interpret

the language of the Plan documents.  Moreover, in Pinto, the Third Circuit found the insurer's

---

[1]  Defendant states that it granted Plaintiff an administrative exception because it was
concerned that he had been confused by documents that he received directly from the hospital.
(Def.'s Mem. of Law in Supp. of Mot. to Dismiss 8.)  The court will not consider this
explanation at this stage because it is not supported by documents incorporated by reference in
Plaintiff's Complaint.

default position of denying benefits to be a procedural anomaly.  214 F.3d at 394 (stating that "whenever the [insurer] was at a crossroads, [it] chose the decision disfavorable to [the beneficiary]").  In the present case, however, IBC's exception favored Plaintiff and cannot be argued by Plaintiff to suggest a conflict of interest.

The court finds that there are no procedural factors suggesting bias in the process by which the administrator came to its decision.  See Post, 2007 U.S. App. LEXIS 21911, at *25 (citing Pinto, 214 F.3d at 393).  Even if the one-time exception could be considered an irregularity, it is minor, a singular occurrence, and not sustained.  See id. at *26.  Therefore, there is little or no justification for further raising the level of scrutiny.  See id.  If anything, the moderately heightened review required by the structural conflict of interest may be mitigated by the lack of procedural bias, to result in only a slightly heightened review.  See id. at *24.  Assuming, at most, a moderate heightening of review and concurrent lessening of deference are required, the court still must defer to any "reasonable and carefully considered conclusions" made by IBC because there was no procedural bias.  See id. at *25.

**2.      The Administrator Properly Exercised The Discretion Accorded It.**

Having determined the appropriate level of review, the court applies the second prong of sliding scale review to conduct a more penetrating review of "the merits of the decision and the evidence of impropriety together to determine whether the administrator properly exercised the discretion accorded it."  Id. at *16-17.

The Third Circuit has provided guidance on the scope of the court's heightened review.

Even under the heightened arbitrary and capricious standard that the court applies here, the court "may not substitute its own judgment for that of the plan administrators." <u>Stratton v. E.I. DuPont De Nemours & Co.</u>, 363 F.3d 250, 256 (3d Cir. 2004) (citing <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan</u>, 298 F.3d 191, 199 (3d Cir. 2002)).  In a case applying the heightened standard, the Third Circuit has held that "a plan administrator's decision will be overturned only if it is clearly not supported by evidence in the record or the administrator has failed to comply with the procedures required by the plan." <u>Id.</u> (quoting <u>Smathers</u>, 298 F.3d at 199).

In <u>Bill Gray Enterprises, Inc. Employee Health & Welfare Plan v. Gourley</u>, the Third Circuit set forth the test for reviewing a plan administrator's interpretation of an ERISA plan.[2] 248 F.3d 206, 218-19 (3d Cir. 2001).  First, a court must determine whether the terms of the plan document are ambiguous. <u>Id.</u> at 218.  "A term is ambiguous if it is subject to reasonable alternative interpretations." <u>Id.</u> (quotations and citation omitted).  If the plan language is clear and unambiguous, a court may not consider other evidence, and "actions reasonably consistent with unambiguous plan language are not arbitrary." <u>Id.</u>  Second, if the terms of the plan are ambiguous, a court must "analyze whether the plan administrator's interpretation of the document is reasonable." <u>Id.</u>

In <u>Bill Gray Enters.</u>, the Third Circuit found that there was no structural conflict of interest and did not apply a heightened form of arbitrary and capricious review. <u>Id.</u> at 216 & n.8.

---

[2] ERISA requires that plan documents "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." <u>Bill Gray Enters.</u>, 248 F.3d at 218 (quoting 29 U.S.C. § 1022(a)).

Rather, the court determined to apply the traditional arbitrary and capricious standard of review unless there was "specific evidence of bias or bad faith," which it did not find.  Id. at 216-218. Despite the non-application of the heightened standard in Bill Gray Enters., the Third Circuit stated that the test in Bill Gray Enters. would nevertheless apply in cases invoking the heightened arbitrary and capricious review standard.  Id. at 218.  With respect to the second prong of the Bill Gray Enters. test, the court stated that "the level of deference the reviewing court will accord the plan administrator's interpretation is guided by" the sliding scale test set forth in Pinto, 214 F.3d at 383.  Bill Gray Enters., 248 F.3d at 218.  This court, therefore, applies the Bill Gray Enters. test in accordance with the at most moderately heightened review, while deferring to any reasonable and carefully considered conclusions by IBC.

### a.   IBC's Actions Are Reasonably Consistent With Unambiguous Plan Language.

#### i.   *The Plan Language Is Not Ambiguous.*

In reviewing IBC's interpretation of the Merck Plan, the court first must determine if the Plan language is ambiguous.  Id.  First, the court considers what are the controlling Plan documents.  Then, the court discusses the terms of the Plan and determines whether the Plan language is ambiguous.

#### (1)   *Controlling Plan Documents.*

The controlling Plan documents, which define the terms at issue for the services at issue

in February and March 2006, are the Personal Choice group contract for the Merck Plan (Def.'s Mot. to Dismiss, App. 186-288), effective October 1, 2005, and the summary plan description published in January 2006 (Def.'s Mot. to Dismiss, App. 74-160).  Plaintiff concedes that the operative Merck Plan contract and 2006 Plan description, which Plaintiff characterizes as a certificate or handbook, contain consistent, identical terms.  (Tr. 24:7-11, 35:21-25.)  Plaintiff does not claim to rely on documents written by Merck, which explain the benefits.  (Tr. 29:12-13.)

Plaintiff urges the court to consider a prior, non-operative Merck Plan contract and a summary plan description for 2005 (Def.'s Mot. to Dismiss, App. 1-73), which contain terms or words different from those used in the controlling Plan documents.  Plaintiff argues that differences can only signify a change in meaning.  His argument, however, ignores several possible reasons for such change, including re-labeling well-understood concepts.

Because the documents urged by Plaintiff were not in effect during the relevant time period, the court will not use them to interpret the language of the controlling documents.[3]  See Smathers, 298 F.3d at 196-97 (reviewing only "the plan in effect at the time the benefits were denied").  The operative Plan documents contain identical terms and do not compete.  The question presented is simply whether the terms at issue can be understood by looking at the operative contract language.

---

[3]  Plaintiff further argues that the 2005 contract should control because the administrator for the Plan, Richard Gabriel Associates, allegedly mailed it to him on March 24, 2006, upon Plaintiff's request for the operative contract.  Even if this is the case, the fact remains that the 2005 contract was not operative at the time and cannot control the analysis here.

### *(2)     The Plan Terms.*

At issue is the manner in which IBC calculates coinsurance amounts that subscribers are required to pay.  Under the terms of the Merck Plan, the "" payment is a percentage of the "Covered Expense," which is determined by the Preferred Facility Provider's "allowable charge" reduced by the "Plan-Wide Discount."  These terms are explained below.

### *(a)     Allowable Charge.*

The "allowable charge" is used to calculate the "Covered Expense," a term which is fleshed out further below.  "'Covered Expense' means the Facility Provider's *allowable charges* for the Covered Services reduced by the Personal Choice Discount in effect at the time that the services were rendered."  (Merck Personal Choice Group Contract ¶ 23, Def.'s Mot. to Dismiss, App. 197 (emphasis added).)  A "Covered Service" is "a service or supply specified in this Contract for which benefits will be provided."  (Merck Personal Choice Group Contract ¶ 23, Def.'s Mot. to Dismiss, App. 198.)

 Plaintiff charges that the term "allowable charge" is not explicitly defined in the Plan documents.  He argues that "allowable charge" must be different from the facility's "billed charge," the term used in prior, non-operative plan documents.  Plaintiff claims that the "allowable charge" must be less than the "provider's charge," and therefore that IBC does not apply any discount to the amount above the allowable charge, that is, the difference between the facility provider's charge and allowable charge.

Defendant argues that the "allowable charge" means those undiscounted charges billed by

the facility for the covered medical services, and would not include so-called non-medical services which IBC does not cover, such as hospital TV costs.  (Tr. 38-39.)  Defendant explains that "the reference to the facility provider's allowable charges means it's still the billed amount but it just makes clear that it's those things that are on the bill that are actually covered."  (Tr. 38:20-23.)

The court finds that the term is clear from the context of the applicable contract language in that everything in a facility's bill is not necessarily allowable.  It can be inferred from the term itself, "allowable charge," that there necessarily may be facility charges that are not covered by the Plan.  Further, the Plan documents specify that the "allowable charges [are] for the Covered Services," which are only those services or supplies covered by the Plan.  The Plan documents thus make clear that facility-provided services not covered by the Plan will not be included in allowable charges and that any discount under the Plan will be applied only to facility charges for services covered by the Plan.  For these reasons, the court finds that the term "allowable charge" is not subject to other reasonable interpretations and is unambiguous.  See Bill Gray Enters., 248 F.3d at 218.


### (b)    *Plan-Wide Discount*.

Defendant explains that the "Plan-Wide Discount" is determined in the following manner.  First, IBC negotiates contractual bulk purchasing arrangements with all of its participating medical service providers for services at a discount.  The rates are not determined by the actual value of particular services provided.  Instead, the rates are intended to result in an

aggregate payment by IBC to the provider over a time period that corresponds to the total amount of services provided to all IBC subscribers in that time period.  Specific payment arrangements can be different for each facility, and the rates may be based on per diem, on the specific procedure, on the specific diagnosis, or other calculations.  The resulting rates may not be the same as the facility's billed amounts and may be higher or lower.

Then, based on the totality of IBC's payment arrangements under <u>all</u> of its facility provider agreements, IBC calculates a Plan-Wide Discount.  The Plan-Wide Discount is calculated by comparing the total amount of all stated charges for services provided to all IBC subscribers by all facility providers, to the total amount actually paid by IBC to all providers for that same time period.  In other words, the total amount that IBC pays under the contract rates with facilities is divided by the total amount that all facilities normally bill for those services.  In 2006, the Plan-Wide Discount amount was 72%.[4]

The Plan documents define "Personal Choice Discount" consistent with the above explanation.  That discount is applicable here and is the same percentage as the Plan-Wide Discount (72%).  The "Personal Choice Discount" is defined as:

> the percentage reduction from Facility billed charges for Covered Service that the Carrier passes on to its Personal Choice customers as a share of the savings the Carrier is expected to realize from its negotiated hospital contracts.  The balance of any savings not passed on to its customers is for the sole benefit of the Carrier. The amount of the Personal Choice Discount may be changed prospectively from time to time.

(Merck Personal Choice Group Contract ¶ 82, Def.'s Mot. to Dismiss, App. 207.)  The "Plan-

---

[4] For example, if allowable charges are $100, and the Plan-Wide Discount is 72%, the Covered Expense is $28.00.  If no deductible is due, and because the coinsurance percentage is 10%, the coinsurance amount would be $2.80.

Wide Discount" is defined almost identically as:

> the percentage reduction from Facility charges for Covered Services that the
> Carrier passes on to its customers as a share of the savings the Carrier is expected
> to realize from its negotiated hospital contracts.  The balance of any savings not
> passed on to its customers is for the sole benefit of the Carrier.  The amount of the
> discount may be changed prospectively from time to time.

(Merck Personal Choice Group Contract ¶ 86, Def.'s Mot. to Dismiss, App. 208.)  The court

finds that the language of the Plan documents is consistent with Defendant's explanation and

clearly defines how the Plan-Wide Discount is determined.  As discussed further below, the court

finds that the phrases "Plan-Wide Discount" and "Personal Choice Discount" are not subject to

other reasonable interpretations and are unambiguous.  See Bill Gray Enters., 248 F.3d at 218.

### (c)  *Covered Expense And Coinsurance Amount*.

Under the Merck Plan, Defendant argues that coinsurance amounts are calculated based

on the "Covered Expense" and not the contractual rate by IBC at the time services are provided.

The "Covered Expense" is calculated by multiplying the facilities billed allowable charges for

particular services by the overall Plan-Wide Discount, i.e., in this case by 72%.  The Merck Plan

contract and summary provide the same definition for Covered Expense.  The Plan reads:

> 'Covered Expense' may not refer to the actual amount(s) paid by the Carrier to the
> Provider(s).  Under [IBC] contracts, the Carrier pays Facility Providers using bulk
> purchasing arrangements that permit it to pay less for services.  The result its that
> IBC is able to offer the Plan Wide Discount to all of its customers and the Carrier,
> under its Facility Provider contracts, is able to offer the Personal Choice Discount
> to its Personal Choice customers.  The amount the Carrier pays at the time of any
> given claim may be more and it may be less than the amount used to calculate the
> Covered Persons' liability.  Rather, 'Covered Expense' means the following:
>
> > (i) For services rendered by a Preferred Facility Provider, 'Covered
> > Expense' means the Facility Provider's allowable charges for the Covered

Services reduced by the Personal Choice Discount in effect at the time that the
services were rendered.

(ii) For services rendered by a Non-Preferred Member Facility Provider
that has a direct contractual arrangement with the Carrier, 'Covered Expense'
means the Facility Provider's allowable charges for the Covered Services reduced
by the Plan-Wide Discount in effect at the time that the services were rendered.

(Merck Personal Choice Group Contract ¶ 23, Def.'s Mot. to Dismiss, App. 197.)

The coinsurance amount that the subscriber is expected to pay (before any cap is reached)
is a percentage of the Covered Expense, i.e., the facility's billed amount reduced by the Plan-
Wide Discount. (Merck Personal Choice Group Contract ¶ 18, Def.'s Mot. to Dismiss, App. 196
(defining "Coinsurance" as "the percentage of the Covered Expenses which must be paid by the
Covered Person").) Here, Plaintiff was to pay 10% of the Covered Expense as his coinsurance
amount.

Plaintiff agrees that: (1) the Plan defines "Coinsurance" as a percentage of the "Covered
Expense," which must be paid by the subscriber, and (2) that the Plan defines "Covered
Expense" as the facility provider's "charges for the Covered Services" reduced by the "Personal
Choice Discount" in effect when the services were rendered. (Pl.'s Mem. of Law in Opp. to
Def.'s Mot. to Dismiss 4.) Plaintiff's major point of contention is the definition of Covered
Expense.

Plaintiff argues that the Covered Expense should be construed as the actual amount of the
contract rate between the facility and IBC that IBC pays the facility at the time the services are
rendered. He posits that the only reasonable interpretation of the Plan is that coinsurance should
be calculated as a percentage of the actual cost for the health care services paid by IBC. Thus,
given that the contract rate that IBC paid to the hospital was lower, he argues that his coinsurance

amount should be a percentage of that lower contract rate, not – as the Plan documents provide –

on the billed charges (the facility provider's allowable charge or provider charge) discounted by

the Plan-Wide Discount.  Plaintiff contends that the statement, "the amount paid by [IBC] at the

time of any given claim may be more or it may be less than the amount used to calculate your

liability," does not give subscribers notice that IBC might pay less than 90% of the facility's

actual billed charges.[5]  (See Merck Personal Choice Group Contract ¶ 23, Def.'s Mot. to Dismiss,

App. 197.)

There is no support for Plaintiff's interpretation of the Plan language.  The Plan definition

of Covered Expense and its calculation is clear and consistent.  The Plan documents make clear

that the contract rate may not be determined by the actual value of particular services.  The Plan

plainly states that the "'Covered Expense' *may not refer to the actual amount(s) paid by the*

*Carrier to the Provider(s)*" and that "[t]he amount the Carrier pays at the time of any given claim

*may be more and it may be less* than the amount used to calculate the Covered Person's liability."

(Merck Personal Choice Group Contract ¶ 23, Def.'s Mot. to Dismiss, App. 197 (emphasis

added).)

Plaintiff likely would not be making this argument if, as the Plan provides, the contract

rate were higher than the billed charges discounted by the Plan-Wide Discount.  As is clear from

the Plan documents, the essence of IBC's coinsurance calculation is to take all contract rates with

facility providers in the aggregate so as to apply a discount across the board to all Plan members,

---

[5]  The Plan subscriber is not left to pay whatever may be the facility's shortfall on its
actual billed charges inasmuch as the facility's agreement with IBC relieves the subscriber of that
risk.

hence the "plan-wide" or "Personal Choice" discount.  In this way, IBC, contrary to Plaintiff's argument, passes on the benefit of its discount to subscribers.

Plaintiff argues that IBC's interpretation of the contract would permit IBC unfettered discretion to pay what it wants and retain any discount it desires, which would make the contract illusory.  Again, the Plan documents do not support this argument.  The Covered Expense is based on the application of the Plan-Wide Discount to the facility's billed amount, which only the facility, not IBC, determines.  The contractual rates of facilities, upon which the Plan-Wide Discount is based, is determined through contract negotiation and is not purely within IBC's control.  Thus, the Plan-Wide Discount, which is calculated by dividing the total amount that IBC pays under the contract rates with facilities by the total amount that the facilities normally bill for those services, is based on variables not solely within IBC's discretion.  As the Plan documents clearly disclose, there is by inference expectable room in this calculation for IBC to make a profit, the primary and legitimate business goal of a for-profit entity: "[t]he balance of any savings not passed on to its customers is for the sole benefit of the carrier."  (Merck Personal Choice Group Contract ¶¶ 82, 86, Def.'s Mot. to Dismiss, App. 207-08.)

The cases cited by Plaintiff in support of his position are distinguishable because the courts there either found that the plan documents at issue failed to inform beneficiaries of the plan's method of calculating insurance payments, or did not reach the issue.  Corsini v. United Healthcare Serv., Inc., 145 F. Supp. 2d 184, 188, 190-91 (D.R.I. 2001) (stating that the health insurance carrier "never informed its subscribers that their co-payments were based on 'charged' fees rather than 'contract fees'" and that it failed to define key terms used in its definition of "reasonable and customary charges" in calculating the coinsurance amount); In re Blue Cross of

W. Pa. Litig., 942 F. Supp. 1061, 1063-65 (W.D. Pa. 1996) (describing the plaintiff's allegation that the health insurance carrier did not disclose to plan participants that it "negotiated with health care providers for lower medical charges than the charges billed to the participants," but not reaching the issue and instead deciding the summary judgment motion on other grounds); McConocha v. Blue Cross & Blue Shield of Ohio, 898 F. Supp. 545, 547-49 (N.D. Ohio 1995) (finding that the plan documents failed to disclose that the insurer negotiated contracts for discounted charges with providers, while charging coinsurance payments based on providers' actual charges); (see Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss 1).

Rather, Everson v. Blue Cross & Blue Shield, 898 F. Supp. 532, 538 (N.D. Ohio 1994), cited by Defendant, is more analogous to the present case.  In that case, similar to the Plaintiff here, the plaintiff alleged that plan participants were forced to make co-payments that were greater than the percentages set forth in the group plan, due to the insurer's undisclosed practice of negotiating discounts with providers and failing to pass on those discounts to subscribers.  Id. at 536.  The group plan provided that "some of the Plan's contracts with Providers allow discounts . . . [which] are for the sole benefit of the Plan" and that co-payment amounts were "calculated according to the Provider's charges for Covered Services without regard to the Plan's discounts."  Id. at 537-38.  The district court found that the plan language unambiguously disclosed that the co-payment amount was calculated based on the provider charge regardless of the discount agreements, and that the plaintiff failed to state a claim for denial of benefits.  Id. at 538.

Following the finding in Everson, the court here finds that the Plan language quoted above unambiguously provides that coinsurance obligations are not based on the contractual rate

paid by IBC to the service provider for a specific service.  See id.  The terms "Covered Expense"

and "Coinsurance," along with the afore-described Plan terms, clearly explain how coinsurance

amounts are calculated, are not subject to other reasonable interpretations, and are unambiguous.

See Bill Gray Enters., 248 F.3d at 218.  Because the Plan language is clear and unambiguous, the

court may not consider other evidence, and must uphold any actions by IBC affecting Plaintiff if

they are reasonably consistent with the Plan language.  See id.

> **ii.      *IBC's Actions Are Reasonably Consistent With Unambiguous Plan Language.***

IBC's calculation of Plaintiff's coinsurance amounts was reasonably consistent with the

unambiguous Plan language.  See id.  The Explanation of Benefits ("EOB") forms[6] sent to

---

[6] The EOB forms reflect coinsurance calculations that are consistent with the Plan, but some of the terms used on the EOB are different.  (See EOB, Def.'s Mot. to Dismiss, App. 303, 305.)  For instance, the EOB uses the term "provider charge" in place of the term "Facility Provider's allowable charge" used in the Plan documents to mean the facility's undiscounted charges.  The EOB refers to "Allowance" in place of the term "Covered Expense" used in the Plan documents to mean the facility provider's allowable charge (or provider charge, as used in the EOB) for the Covered Service reduced by the Plan-Wide Discount.  The EOB refers to "co-insurance amount" in place of the very similar term "Coinsurance" used in the Plan documents to mean the percentage of the Covered Expense (or Allowance, as used in the EOB).

The EOB explains that the "Plan-Wide Discount" is used to calculate the "Allowance" from the "provider charge."  Consistent with this concept, the Plan documents state that the "Plan-Wide Discount" is used to calculate the "Covered Expense" from the "Facility Provider's allowable charges."

Plaintiff argues that the differing terms in the EOB support his interpretation of the Plan documents.  Plaintiff has not provided legal support for why the EOB forms should be considered a controlling document.  Indeed, because the court has found that the terms of the operative Plan documents are unambiguous, the court cannot look to extrinsic evidence.  See Bill Gray Enters., 248 F.3d at 218.  Even if the court were to find that the Plan language was ambiguous and to turn to extrinsic evidence, the court's treatment of the EOB would not change. The terms in the EOB and Plan documents may differ, but their meaning is clear from the respective documents and is consistent across the documents.

Plaintiff for each of the three overcharges that Plaintiff alleges correctly calculate coinsurance amounts consistent with the Plan language. (See EOB, Def.'s Mot. to Dismiss, App. 292, 303, 305.) Plaintiff does not contest that IBC's calculations are consistent with IBC's interpretation, which he simply refuses to accept as correct.

Regarding the first occasion, the EOB for MRI services at Doylestown Hospital reflects a provider charge or allowable charge of $5,537.00 and an Allowance or Covered Expense of $1,661.10, based on the 72% Plan-Wide Discount. (Compl. ¶ 25; EOB, Def.'s Mot. to Dismiss, App. 292.) The EOB states that Plaintiff owed a deductible of $19.22, resulting in a net Allowance or Covered Expense of $1,641.88. (Id.) The EOB showed a $164.19 coinsurance amount, which was 10% of $1,641.88. (Id.) Although Plaintiff obtained a bill directly from the hospital showing that IBC paid the hospital a contractual rate of $816.20 at the time the services were provided, (Compl. ¶ 26), as previously discussed, the Plan documents make clear that the coinsurance amount is not a percentage of the contractual rate, but of the Allowance or Covered Expense, which is determined by the provider charge or allowable charge reduced by the Plan-Wide Discount. The administrative exception IBC granted to Plaintiff for this occasion, charging him a coinsurance payment of $70.31, does not affect the court's analysis. As discussed previously, this determination did not involve interpretation of the language of the Plan documents.

Regarding the second occasion, the EOB for services at Central Montgomery Hospital on February 10 and 21, 2006, reflects a provider charge or allowable charge of $11,034.71 and an Allowance or Covered Expense of $3,089.71, based on the 72% Plan-Wide Discount. (Compl. ¶ 28; EOB, Def.'s Mot. to Dismiss, App. 303.) The deductible was $00.00. (Id.) The EOB thus

showed a $308.97 coinsurance amount, which was 10% of $3,089.71.  (Id.)

Regarding the third occasion, the EOB for services at Doylestown Hospital on March 3, 2006, similarly reflects a provider charge or allowable charge and then an Allowance or Covered Expense of $1,550.35, based on the 72% Plan-Wide Discount.  (Compl. ¶ 28; EOB, Def.'s Mot. to Dismiss, App. 305.)  The deductible was $00.00.  (Id.)  Although the coinsurance payment would have been $155.03, or 10% of $1,550.35, IBC determined that Plaintiff had already paid a total of $385.75 in out-of-pocket coinsurance payments, and could not exceed his coinsurance cap of $500.  The EOB thus showed a $114.25 coinsurance amount so as not to exceed the $500 cap.  (Id.)  The EOB forms for the three occasions show that IBC calculated the coinsurance amounts reasonably consistent with the Plan language.

IBC unambiguously disclosed the method for calculating coinsurance amounts in the Plan documents and correctly applied it.  IBC' determination of Plaintiff's coinsurance amount was not arbitrary.  Plaintiff therefore fails to state a claim upon which relief can be granted.

### b.      Assuming The Terms Of The Plan Are Ambiguous, The Plan Administrator's Interpretation Of The Document Is Reasonable.

Even if the terms of the Plan are ambiguous, the court upholds the administrator's interpretation of the Plan documents because it is reasonable and carefully considered, for the reasons discussed above.  See Post v. Hartford Ins. Co., No. 05-4927, 2007 U.S. App. LEXIS 21911, at *25 (3d Cir. Sept. 13, 2007) (precedential); Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001).  Because the administrator's interpretation of the Plan documents is reasonable and carefully considered, the court also defers

to the administrator's interpretation.  <u>See</u> <u>Post</u>, 2007 U.S. App. LEXIS 21911, at *25; <u>Stratton v.</u>
<u>E.I. DuPont De Nemours & Co.</u>, 363 F.3d 250, 256 (3d Cir. 2004).  Accordingly, IBC's decision
was not arbitrary and stands, and the court will not proceed to the third step of the application of
sliding scale review to rule on the merits.  <u>See</u> <u>Post</u>, 2007 U.S. App. LEXIS 21911, at *16-17.


## V.  Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted.  An appropriate
Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK E. VOLITIS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-05425 |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | |
| | : | |
| Defendant. | : | |

## **ORDER**

AND NOW, this 19th day of October, 2007, upon consideration of Defendant

Independence Blue Cross' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P.

12(b)(6) (Docket No. 6), Plaintiff Patrick E. Volitis' Response in opposition thereto, and

Defendant's Reply, and Plaintiff's Motion to Strike Defendant's Reply (Docket No. 12) and

Defendant's Response in opposition thereto, as well as oral argument held on the motions, it is

hereby ORDERED that Defendant's Motion to Dismiss is GRANTED and Plaintiff's Motion to

Strike Defendant's Reply is DENIED for the reasons set forth in the attached memorandum.


BY THE COURT:


        S/ James T. Giles
                                    J.